

# NUMBER 13-21-00438-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF T.C. AND K.C., CHILDREN

**On appeal from the County Court at Law No. 5
of Nueces County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina
Memorandum Opinion by Justice Tijerina**

Appellant B.C. (Father) appeals the termination of his parental rights to his two children, T.C.[1] and K.C. By his sole issue, Father argues the evidence was legally and factually insufficient to support a finding that termination of his parent-child relationship was in the best interest of the children. We affirm.

---

[1] We use initials to protect the identity of the children. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

## I. BACKGROUND

T.C. was born September 6, 2019, and K.C. was born August 24, 2020. On November 16, 2021, the trial court held a bench trial regarding the termination of Father's parental rights.

### 1. Anastasia Fillmore's Testimony

Anastasia Fillmore was the conservatorship caseworker for the children. She stated that Texas Department of Family and Protective Services (the Department) was involved with K.O. (Mother) since 2013 regarding another child, O.O., because Mother admitted she had substance abuse problems and was not complying with her family service plan. While O.O.'s case was pending, Mother gave birth to T.C. while she was incarcerated, and T.C. was removed from her care. While T.C.'s case was pending, Mother gave birth to K.C.; he was born methamphetamine positive and was also removed.

When Fillmore began investigating this case, Father was incarcerated. According to Fillmore, Father was ordered to submit to drug tests; complete parenting classes; attend individual counseling, substance abuse, and anger management classes; and show stable housing and employment. Fillmore testified that Father did not complete or even attempt to complete his family service plan. Although Father insisted that he wanted to parent his children, he never informed Fillmore that he wanted to make progress on his family service plan.

She stated that on one occasion, Father provided her with one large box of diapers and wipes, which she gave to the foster family. It was her opinion that Father did not form

2

a bond or relationship with the children because he rarely visited the children. Before his incarceration, she stated that he only had "one or two" visits with the children. Following a positive paternity test and an adjudication of paternity, Father still did not visit the children. She testified that the children had been with their foster family their entire lives. For this reason, all the relative placements that Father recommended for the children had opted out and refused to be considered. Fillmore specified that the foster family was very vocal about pursuing adoption and provided the children with everything they needed while Father had been in and out of jail throughout the children's lives. Thus, Fillmore stated that termination of Father's rights was in the best interest of the children.

## 2. Tammy Sanders

Conservatorship caseworker Tammy Sanders testified that Father was currently incarcerated. She reported that Father "was always angry" and "just always confrontational." She mailed Father a letter informing him of her status as the children's caseworker. Father requested a phone call with Sanders. However, when the time came for Father and Sanders to speak, Father refused to come to the phone.

Sanders reported that the foster family has been very communicative with the Department, keeps up with the children's needs, is protective of the children, has a suitable home for the children, and intends to adopt them. It was her opinion that Father's rights should be terminated because the children have never lived with Father and needed stability. She stated the children have bonded with their foster family because "it's a great environment." According to Sanders, their foster family is the only home the children have ever known.

### 3.    Father's Testimony

Father testified that he was currently incarcerated for the federal charge of felon in possession of a firearm and was awaiting sentencing, which was to occur the day after the final hearing. In addition to T.C. and K.C., he has four other children.[2] When asked where T.C. and K.C. were, he responded "I guess they're—I don't know—here in Corpus, I believe." According to Father, he had been in and out of the children's lives, but it was his desire to be with them in some capacity.

He stated that when T.C. was born, he intended to take the child from the hospital, but he was not listed on T.C.'s birth certificate, so he was unable to take him home. Despite not knowing if T.C. was his biological son, Father claimed he visited T.C. "multiple times." He stated he was employed up until his incarceration. It was his testimony that had he not been incarcerated, he would have provided T.C. with a home, clothing, diapers, and childcare. Father stated that he did not know K.C. was his biological child until one day before the trial; nonetheless, he loved both children, had bonded with them, and wanted what was best for them. He asked the trial court for "maybe part time or part custody . . . temporary custody" until he figured out how long he needed to serve his sentence. He further stated that he did not begin his family service plan because the DNA test did not confirm T.C. was his child until 2020, and the COVID pandemic limited his options.

Father admitted that he knew the lifestyle Mother lived and still allowed his children to be exposed to that environment because "he can't tell [Mother] how to live her life, you

---

[2] His other children's ages range from nineteen to twenty-four.

4

know? I can't—I can't force her or, you know, tell her, hey, this is what you got to do or whatever. She's a grown woman, you know. She knows right from wrong." According to Father, he only financially provided for the children one time "because it was a test—it was a test run for me. I wanted to see if the kids were going to get . . . the stuff I purchased." Father confirmed the children received the diapers and wipes he bought, but he acknowledged he did not financially provide for the children thereafter.

**4.    Desirae Salinas**

Desirae Salinas stated that she was a conservatorship caseworker for T.C., and Father had not made progress towards completing his family service plan. She explained that Father was required to submit to drug tests because he had previously been arrested for several drug-related offenses, but he did not complete a single drug test. Regarding Father's paternity, Salinas further clarified that she provided a date for his testing, but "[h]e just—he never went." She stated that she would explain to him what he needed to do, yet there "was always an excuse, a reason" he gave not to comply.

Salinas testified that she placed the children in the foster home and that the foster parents "absolutely" met all the needs of the children. She opined that termination of Father's rights was in the best interests of the children because they have been doing great with their foster family and have been provided love and protection while Father was incarcerated.

**5.    Foster Family**

G.G. (Foster Mother) testified that T.C. has lived in her home since he was ten days old; K.C. arrived right after he left the Neonatal Intensive Care Unit (NICU). Foster

Mother stated that she has another adopted two-year-old daughter that resides with them. She stated T.C. and K.C. have bonded with the two-year-old child: "[T]hey're attached. They were brought up as twins."

When T.C. arrived in her home, "he was tongue-tied" and suffered from a hole in his heart.[3] Foster Mother has met all his medical needs and with therapy, his speech has improved significantly. Foster Mother stated that she addressed K.C.'s medical needs while he was in the NICU, even before he arrived at her home. For example, she spent time with him in the NICU, fed him hourly because he had difficulty eating and was not getting enough nourishment, and took him to his weekly doctor's appointments. She further provided him with the therapy he needed for his nervous system, among other needs. Foster Mother stated that K.C. was now meeting all his milestones. Foster Mother explained that she had an extensive family who would be willing to provide additional support for the children, should she need it. Foster Mother stated that she loves the children, has formed a bond with them, cares about their safety, and has provided them with lots of love and a family.

M.G. (Foster Father) testified that he has three grown children of his own, ages eighteen through twenty-six. Regarding T.C. and K.C., he stated, "I love them with all my heart . . . I never thought I could love—I love them exactly the same, if not more, than my natural kids. I love them with all my heart."

---

[3] According to the medical records in the record, T.C. underwent a "dental tongue clip" at a children's hospital, which Foster Mother identified as being "tongue-tied."

**6.      Termination**

At the conclusion of the trial, the trial court terminated Mother and Father's parental rights and appointed the Department the children's permanent managing conservator.[4] As to Father, the trial court found by clear and convincing evidence that Father had knowingly placed the children with persons who endangered the physical or emotional well-being of the children, constructively abandoned the children, and failed to comply with his court ordered provisions. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (N), (O).[5] The trial court also found by clear and convicting evidence that termination of Father's parental rights was in the children's best interests. *See id.* § 161.001(b)(2). Father then appealed.

## II.      STANDARD OF REVIEW

For a trial court to terminate a parent-child relationship, the party seeking termination must prove by clear and convincing evidence that: (1) the parent's actions or omissions satisfy at least one ground listed in § 161.001(b)(1) of the family code; and (2) termination is in the child's best interest. *See id.* § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient to support the trial court's

---

[4] Mother is not a party to this appeal.

[5] Father does not challenge these predicate findings on appeal.

7

findings, we look at all the evidence in the light most favorable to the finding ans ask whether a reasonable factfinder could have formed a firm belief or conviction the finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence a reasonable factfinder could have disbelieved or found incredible. *Id.*

When reviewing a challenge to the factual sufficiency of the evidence, we give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.*; *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *In re. J.F.C.*, 96 S.W.3d at 266. We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

### III. ANALYSIS

Father argues the evidence is legally and factually insufficient to support a finding that termination of his parental rights is in the children's best interest.

### A. Best Interest

When considering the best interest of a child, we recognize there is a strong presumption that the child's best interest is served by preserving the parent-child

relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).

In determining whether a parent is willing and able to provide the child with a safe environment, we consider the factors set forth in the family code as well as the *Holley* factors.[6] *See id.* § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive. *In re C.H.*, 89 S.W.3d at 27. "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* In analyzing these factors, we focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

Evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 28. "A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact

---

[6] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

## B. Discussion

### 1. Children's Desires, Ages, and Vulnerabilities

"When children are too young to express their desires, the factfinder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied) (quoting *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.)). Here, the children are less than three years old, but T.C. has lived with his foster family since he was ten days old and K.C. since birth. The Department and the foster family testified the children are well-cared for by their foster family. T.C. had medical conditions, which Foster Mother addressed by providing T.C. with multiple medical appointments and therapy. Although T.C. "was tongue-tied" when he was first placed in Foster Mother's care, he "doesn't stop talking" now as a result of Foster Mother's intervention.

Similarly, K.C. was born positive for methamphetamine and experienced problems eating, which required Foster Mother to feed him every hour. Foster Mother took K.C. to his weekly medical appointments and therapy. He is no longer experiencing medical issues. Although K.C. initially had nervous system issues which prevented him from extending his legs, now he "is running around."

The record indicates that Father was not available for most of the children's lives and was incarcerated at the time of trial on a federal charge, which carried a minimum

10

punishment of five years. While one child has spent very little time with Father, the other child has never spent time with Father.[7] *See In re U.G.G.*, 573 S.W.3d 391, 402 (Tex. App.—El Paso 2019, no pet.) (determining that factfinder could consider that child "spent minimal time in presence of a parent" when considering the desire of toddler who was unable to articulate her wishes). The evidence also established that the children are very young and well-cared for by their foster family. These factors weigh in favor of termination.

## 2. Children's Present and Future Emotional and Physical Needs, Plans for the Children, and Parental Abilities

"The need for permanence is the paramount consideration for the child's present and future physical and emotional needs." *In re S.J.R.-Z.*, 537 S.W.3d at 693. "[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a).

The evidence presented at trial showed that the children have been with their foster family their entire lives, and Father played no role in meeting the children's medical or developmental needs. Both children have special needs and have improved significantly since their foster placement. *See In re S.D.*, 980 S.W.2d 758, 764 (Tex. App.—San Antonio 1998, pet. denied) (holding it was in the children's best interests to place them "in a stable environment where they can receive proper care for their special needs"). Furthermore, it is clear from the testimony that the foster family has continued to address and accommodate the children's physical and emotional needs. The Department testified that the foster home was "absolutely" and "most definitely" a suitable placement for the

---

[7] Father also admitted he was "in and out" of his four other children's lives.

11

children as the foster family has provided a drug-free environment and the stability, structure, security, and consistency that the children need. Finally, the evidence shows that the children have strongly bonded with their foster family and foster sister, and the foster family desires to adopt the children and love them as their own. *See In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (providing that the factfinder may consider whether the children have bonded with the foster family and are well-cared for by them when the children are too young to express their desires).

In contrast, Father was inattentive to the basic needs of the children even when he was not incarcerated. For example, one of the children tested positive for methamphetamine when he was born. Father admitted he knew the lifestyle Mother lived and still allowed his children to be exposed to drug use because "he can't tell [Mother] how to live her life," and Mother knows "right from wrong." Rather than attempting to intervene, Father merely told Mother, "What you're doing is wrong." *See In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied) (considering the parent's history of endangering and neglecting the children and of exposing the children to domestic violence in its review of the evidence supporting the best interest determination). Thus, Father endangered the children by accepting Mother's endangering conduct and neglected the children while they were in her care, which resulted in significant physical and emotional harm to the children. *See In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.— Dallas 2019, pet. denied) (providing that evidence that a parent allowed a child to be around persons using drugs can support a conclusion that the child's surroundings endanger the child's physical or emotional well-being); *see also In re J.J.*, No. 07-13-

12

00117-CV, 2013 WL 4711542, at *4 (Tex. App.—Amarillo Aug. 29, 2013, no pet.) (mem. op.) ("[A] parent's decision to leave a child in the care of a known drug user is relevant to the predicate acts or omissions outlined in subsections (D) and (E)."). The Department further opined that Father has not demonstrated that he can meet the basic needs of the children. Finally, Father would be unable to care for the children because he is currently incarcerated, requested "maybe part time or part custody," and failed to articulate a plan to care for the children going forward.[8] These factors weigh in favor of termination.

### 3.    History of Substance Abuse and Acts of Violence

Some of the factors to consider in a best interest determination are whether there is a history of substance abuse or assaultive conduct by the child's family or others who have access to the child's home. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (8). Here, there was evidence that Father was previously arrested for assault causing bodily injury, aggravated assault, and drug-related offenses.[9] The Department repeatedly testified that Father never submitted to a drug test despite the fact that he was ordered to undergo such tests. Thus, Father's violent and drug-related criminal history, and his failure to provide a negative drug test supports the trial court's best interest findings. *See In re S.J.R.-Z.*, 537 S.W.3d at 693 ("This court considers a parent's conduct before and after the Department's removal of the children."); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex.

---

[8] Father testified that he believed "there's a good chance tomorrow that the judge could have a good heart and say . . . five to ten years."

[9] Father admitted he has been arrested for the following offenses: assault causing bodily injury against a family member (twice), terroristic threat, unlawful restraint, assault causing bodily injury (twice), evading arrest, criminal mischief, aggravated assault with a deadly weapon, theft of a firearm, unlawful possession of a firearm by a felon (twice), possession of a controlled substance, four grams to 200 grams, possession of marijuana, resisting arrest, search or transport, and evading arrest or detention.

2006); *see also In re E.A.*, No. 13-06-503-CV, 2007 WL 2471459, at *8 (Tex. App.—Corpus Christi–Edinburg Aug. 31, 2007, no pet.) (mem. op.) ("Because there is evidence that appellant's past actions were unsuitable, the trial court could have inferred that similar unsuitable conduct could recur in the future if the children are returned to appellant."). These factors weigh in favor of termination.

### 4. Programs Available and Parent's Acts, Omissions, and Willingness to Accept Help

Father's family service plan was admitted into evidence and required Father to take drug tests, complete parenting classes, attend individual counseling, attend substance abuse classes, attend anger management classes, and show stable housing and employment. Several Department employees testified that Father did not participate in a single service. Furthermore, Father refused to work with Sanders after she scheduled an appointment with him, demonstrating that Father was not willing to interact with the Department. *See* TEX. FAM. CODE ANN. § 263.307(b)(10) (stating that willingness and ability "to cooperate with and facilitate an appropriate agency's close supervision" is relevant consideration in deciding whether parent can provide child with safe environment). This lack of effort indicates Father was unwilling to accept help or take steps to effect positive environmental change for the children even after a DNA test confirmed his paternity. *See Wilson v. State*, 116 S.W.3d 923, 925 (Tex. App.—Dallas 2003, no pet.) (providing that a parent's lack of motivation in improving parenting skills is evidence to support a finding that termination is in the child's best interest). Moreover, the Department stated that Father always had an "excuse" or a "reason" to not submit to drug tests. Evidence was presented that the few times that Father "visited" T.C., "he would sit

14

in the car parking lot" without entering the building, or "he would drop [Mother] off" without going in. At the time of the final hearing, it had been two years since T.C. had any contact with Father.

Although Father argues that he "has a home and the financial means to raise the children" because he has money in his inmate account, the record provides that Father is incarcerated and is not currently employed. "Without stability, income, or a home, [a parent] is unable to provide for the child's emotional and physical needs." *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.). These factors also weigh in favor of termination.

### 5.    Conclusion

Having reviewed the record and considered the evidence in the appropriate light for each standard of review, we conclude the trial court could have formed a firm belief or conviction that termination of Father's parental rights is in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Accordingly, we hold the evidence is legally and factually sufficient to support the trial court's best-interest findings.

### IV.    CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Delivered and filed on the
26th day of May, 2022.

15